on behalf of the appellant Harley Harmon. Harley Harmon, your honors, was convicted of 37 counts of mail fraud. Mr. Harmon was a mortgage broker in Las Vegas, Nevada. And in the early 1990s, he had occasion to first get involved in construction financing with an individual by the name of Robbins who had come to him with an idea of financing Robbins' project called Tanglewood. And Robbins couldn't get financing conventionally. He had to go to a mortgage broker. And he proposed that Harmon fund this loan on a periodic basis. Much like on-time delivery of inventory, Robbins conceived the idea that rather than paying interest on a loan of $500,000 or $600,000, he would pay a loan from Harmon for $500,000 or $600,000, but it would be fund incrementally as the money was needed. So that he could avoid the rather onerous interest charges that construction financing through a mortgage broker would naturally incur. What has that got to do with telling people that they're going to get first deeds of trust when you have no intention of being the first? Or for example, what has that got to do with that? Well, it gives you the background. And Mr. Harmon did not. I understand the background. I'm saying what does it have to do with that? Well, what it has to do with it is that Robbins was an independent individual, had an independent business, and he developed problems with his construction loans. Now, I understand that. I said, what does it have to do with Harmon telling Investor A, I am going to give you, if you'll give me money, I will give you a first deed of trust on a parcel of property, when he had no intention of giving the person a first deed of trust and indeed gave him a second, third, fourth, or fifth? Well, what does it have to do with that? That's my question. Well, only his background. But I can tell you that... No, I know it's background. So, but I'm fine. It's background. All right. I'll answer the question of what about that problem? Well, that is a problem. That's why he was charged. Only he insists that he did not deliberately misrepresent the position. Who cares about what he insists? The investor said he did X. He said, no, I didn't do X. And the jury believed the investors. What do we do with that? Well, okay. Not every investor said that he said X. Some investors said that. Yes, some investors did. What do we do with that? Well, in every instance, Mr. Harmon provided documentation as to the nature of the loan. The person lending the money would receive either a preliminary title report, escrow instructions, or a title report, all of which would show the actual position of the loan. Now these weren't documents that Mr. Harmon prepared. These were documents that were prepared by a title company. The government characterizes them as legal mumbo-jumbo. But in reality, they were clear evidence of what it was the lender was receiving. Now, when Mr. Harmon... Is your position then that the investor says, I don't know a lot about a whole lot of stinking real property documents, which I'm afraid most people behave that way. I don't know if you've ever tried to read all of the documents you get in an escrow in an ordinary transaction while everybody sits around and looks at you like you're nuts, but that's not here or there. I don't know what all that stuff said. What I'm telling you, investor says, is that he told me X and I would never have put my money into it if he hadn't told me X. That's what the investor said. I realize some investors said that. Now you're telling me that... I'm just trying to get your position. Your position would be that because of the paperwork and because of what he says, no rational juror could believe that he did what the investor said. Is that true? That is the point I'm trying to make. And the reason I say that is this investigation commences by the state in 1997. By December of 1997, Harley Harmon's mortgage company is closed. He's not indicted by the federal government until April of 2001, and the trial occurs in January and February of 2003. Now during that period of time, there is a lot of anger expressed at Mr. Harmon. It's in the record that a state court judge decided that he was going to treat all the loans on the Greenwood property as firsts. Now there were a lot of complaints. People were saying, no, I was promised a first and I got a second. People did say that Mr. Harmon represented that. Mr. Harmon denied that he ever represented that to anyone and had the documentation to corroborate that. But there was this confusion, there is this confusion in the record as to Mr. Harmon says, I never would have deliberately misrepresented a deed. He does acknowledge that with every one of the Heather Ridge loans, that he told these people it was a first. He admitted that. He said that that was his intention, that that loan be a first, and the second of those two loans, which turned out to be a fifth, was intended to be a portion or part of the original Heather Ridge loan, which the documentation shows with the subsequent financial transactions involving Money Mart, did in fact become a first so it could be later subordinated as a second to the Money Mart loan. Mr. Harmon dealt with a man by the name of Stroud. He dealt with him, Straub, on the telephone. Mr. Straub had been referred to Mr. Harmon by his father. Mr. Straub indicated Harmon had told him that he was investing in a first. Harmon sent him a documentation showing that it was a fifth. Hardly to acknowledge. Yes, I probably told him it was a first, but that was a mistake. It should have been part of the earlier loan. That loan was underfunded. And had he brought it to my attention, I would have corrected it. But I never intended to deceive this man. And that's what's so important here. Mr. Harmon's intention, what did he intend? Did he intend to deceive these people? He is able to document in each and every instance that these people received documentation that showed the actual position of their loans. And given that fact, a rational trial of jury, even looking at the evidence in the light most favorable to the government, has, I believe, difficulty finding beyond a reasonable doubt that he had the intent to deceive. He always accompanied the documents. He had no choice about the documents. I mean, the documents are prepared by somebody else, and he doesn't really have the opportunity to withhold those documents. He did, in fact. So that would suggest in that kind of transaction there never could be a fraud conviction, because the investors eventually get paperwork that tell them differently, that you could never conclude, a jury could never rationally conclude that somebody intended to make a decision different. By state law, he was required to have the investors complete a form where they acknowledge that they receive or decline to receive certain documentation. Among those items that they acknowledge receiving or declining to receive are the loan documents, the escrow instructions, and the title documents. So these people had that opportunity. He set them out, whether they declined or not, the information concerning the position of the loan. He knew that. He wasn't intending to deceive anyone. He told them what the loan position was by documenting it. Now, he denies, and I can't deny that there isn't a conflict in the evidence. There is. Some investors said, yes, he led me to believe it was a first when it was a second. He acknowledges But on some occasions he actually admits that that's true. Absolutely. He admits it's true, but said, I made a mistake. No, he admits it. Only in one instance does he say it was a mistake, and that's the Straub loan. In one instance, yeah. He says, I admit that I told him X, and he got a Y, but that was a mistake. That's correct. And no rational juror could feel otherwise. Well, I mean, there's a conflict in the evidence, but that same investor who was the subject of that transaction received the documentation showing it was a fifth, and this was not a hard-to-understand document. Ergo, no rational juror could find the contrary. That's your position, correct? That is my position. Thank you, Your Honor. Well, Your Honor, this goes to the question of the sufficiency of the evidence, but when one looks at the evidence, one also has to ask, was there, established by the government, an actual violation of Title 18, Section 1341? That crime requires that there be a fraudulent scheme and that the mails be used to implement the scheme. A mere incidental use of the mails is not sufficient. Here we have Mr. Harmon convicted of 37 counts. Five of those counts involve Mr. Harmon's having mailed to investors notices that extensions were going to be needed on the loans because the borrower needed additional time. The government suggests that those five instances were instances where Mr. Harmon used the mails to lull his investors. In 29 instances, I'm sorry, 27 instances, Harmon is convicted of mail fraud because he mailed the investors their interest checks. And in three instances, he is convicted because he mailed them notice of what it was, in fact, he had given them. With regard to the use of the mails for the mailing of interest checks, Mr. Harmon was contractually obliged to send those interest checks. He was contractually bound to do that. He was morally bound to do that. He was not, in most of these instances, the borrower. He was the broker. In two instances, Greenwood and Lake Mead, he served in dual capacities as both broker and borrower. But in every instance, once that money was received from the borrower, whether it be from himself or from the Robins or other borrowers, he had to mail those checks to those people he had to deliver those checks. Not to have done that would have been wrong. He would have been committing a state crime of embezzlement had he received those funds and not distributed them. So to suggest that he mailed those checks as a means of lulling his investors is simply wrong. With regard to the instances where he mailed them notices of what it was they had received, there was no intent to defraud. None of the mailings that he had involved himself in in any of these 37 instances involved any kind of misrepresentation. In every instance, the money was already received. These mailings were not designed or intended to facilitate this fraud. Rather, they were intended to give these investors what they were due, their interest payments. Counsel, let me ask you another question. Yes, sir. It seems to me that one of the theories or one of the complaints was that he would tell an investor, you're putting your property into parcel A. Would you like to look at it? The investor would come down and look at it. That's a terrific parcel. That's going to be the greatest thing since sliced bread. But then, after the money comes in, the money is diverted to a different project entirely. But he doesn't tell the investors, your money is going to be diverted to other projects. He just says, your money is going into project A. That's correct. That's what the investors said. And he acknowledges that. He acknowledges that. One of the things you have to understand is that he was the subject of a state investigation that commenced in 1997. He was questioned extensively in March of 97 and July of 97 by state investigators. Some of these periods of questioning were taken under oath. In each instance, there were two attorneys there representing the And in July of 1997, he was asked by one of the regulators about a loan called Rosewood, which was in trouble. And he was asked by the regulator, what are you going to do about these investors? And what Mr. Harmon said in July of 1997, before his mortgage company is closed, before some of these monies were moved, four years before he's indicted, Mr. Harmon said, I have put money from Greenwood and Lake Mead into these projects, into these other projects. If I have to, to save those projects, I will move more of that money into that project. Now he said that in front of two regulators and two states' attorneys general. No one said, Mr. Harmon, you can't do that. He believed that he had the authority and the discretion to do that, as he testified, as long as those monies came back and as long as the projects were built. Did he tell the investors that? No, he did not. Well, isn't that the question? Well, I don't know that it is the question. When you look at the issue, the conviction isn't that Mr. Harmon had an ill heart or hoped to deprive the investors of money. The question is whether he accurately described to him what he actually did. And if he failed to tell them that their money wasn't going to go to Project X, but he thought he had the discretion to put it in Project Y, and they heard from him it was going to go to X, that's a misstatement. Well, it, it, it, well, let me, let me approach it from this direction. Once the money was received by Mr. Harmon from the investor, the state law requires that that money be delivered to the borrower. All right. So it's the borrower's money. It's not Mr. Harmon's. It's no longer the investor's. It is the borrower's. The documentation that each person executed showed that they were investing in a, in a trust, deed of trust on a particular piece of property. But nowhere does it specify where or how that money is to be utilized. It does not specify. The investor is given a deed of trust against a certain piece of property. The government's own expert testified that that just never occurs in loan transactions where the purpose of the loan is specified. Rather, only that, that the money is being loaned against a particular piece of property. What difference does that make? Well, it makes every good difference when we look at Mr. Harmon's intention, whether or not he was a, I mean, first of all, I don't know that, I don't know that he, he said it will only be used. He, the money was solicited for a particular project. But the, there were two, two types of things that happens. We had the Robbins loans and Walker loans. Robbins develops a number of projects. Many of them have common investors. Robbins, it's Robbins money, he needs the money for interest payments. He gets a, a, a, a, a, a, he gets money for Heatherwood and he needs, or for, for Rosewood and he needs money to pay the interest on Heatherwood investors. So he takes the money from Rosewood and tells Harmon to pay the investors on Heatherwood. It's the same borrower. Harmon gets Robbins to sign notes obligating himself to repay these monies, loans, from one, one loan to the other. He does the same thing with Walker. When, when you have money going from a project in which he was directly involved as a borrower, what he did is the, when the money was moved from, from a, a Harmon slash Walker loan to a Robbins loan, the money would be given to Robbins and Robbins would then execute a deed of trust in the name of that project from whom he was borrowing the money. Green point. When the money is received, there's no indication from, to, to the investor, nor would there be, does the, the investor doesn't understand that it's going to go to the national title company and sit there interminably, might not have Mr. Harmon put in some other institution to draw better interest on behalf of the project before it is actually utilized. Mr. Harmon conceived of the idea of lending it to another project, that loan being documented as all this was, with the understanding that the, that money in the Robbins project, having come from the, the Greenwood project is now secured in the Robbins project by the assignment of a partial deed of trust. What I'm talking about is intent, criminal intent. You've asked, was he obligated to tell these people that that was what he was going to do? He did not believe that he was, as long as the money was accounted for and he had it accounted for. This was done openly. It was done with the explicit knowledge and the documentation, not of his staff, but of the staff of the national title company, who met his direction, documented every one of these transfers. What we're talking about here is the intent to deceive. I understand that these people lost money. I understand they may have been given, given money to Mr. Harmon with the understanding it was going to be used for one project and, and it turns out that a portion or all of it was used for another project. But what was Mr. Harmon's intention? Was it his intention to deceive these people when he's documenting intention to tell them what he was actually going to use the money for? And if the answer to that question is no, which I think it is, then I don't see what the, what the argument's about. Well, uh, did you want to save any time at all for rebuttal? Yes, I do. Thank you. Thank you. May it please the court. Daniel Sheets appearing on behalf of the United States. I wish to respond to the defendant's arguments about the sufficiency of the evidence and the mailings, but if I'm preaching to the choir that we've already made our case and I'll be happy to sit down early. No, don't assume anything. With respect to. You can't trust our questions as being indicative of anything. We don't make representations. I didn't ask many questions at first of that, that go around, but, uh, you know, don't, I wouldn't assume anything. All right. The, uh, the court has identified that there were two theories of prosecution in this case. I mean, if you're confident in your position, I mean, you don't have to say anything. If you don't want, it's. I'm very confident in my position. This feels like giving a closing argument all over again. Let me share it with you. It's true that one of the theories is when you know you're ahead, you might as well sit down and not say anything, but, um, you have to know you're ahead. I'm going to tell you what I'm ahead. So I'm going to deal with the mailings. Let me go right to that. Mr. Kremen argues that the defendant did not have the intent to send these mailings in execution of the scheme because Mr. Harmon had a contractual obligation to send the mailings. The Supreme court doesn't agree with his viewpoint in the decision of Schmuck versus United States at 489 U S the Supreme court said that even though you have an obligation to send mailings, those mailings can be in execution of the scheme. They don't have to contain false statements. They can be simply routine mailings. The question is whether the sender had the intent that those mailings would somehow further the scheme. In this case, to determine intent, we don't have to rely upon direct evidence. We can rely upon the statements of the defendant. We can rely upon his conduct. We can rely upon what he knew. On cross-examination, Mr. Harmon admitted that he knew that if he did not send out those interest checks, that investors would call him, they would hound him, they would pound him. They would drive him nuts to find out where the money was. You look at those other mailings that he sent out as well. The mailings that said here's your investment. Your investment is going to project A, project B, or project C. He sent those out as routine, but he knew that that was part of the course of making this appear legitimate. All along, Mr. Harmon's intent was to take the money from one project, divert it temporarily to the other project, hoping that the other project that was facing financial distress would be healed, and then he could bring the money back to the first project and develop it as promised. Given those facts, he knew that if he continued the mailings along the interest checks, these investors would not know that he temporarily diverted the money. They would not know that he took a risk, that he increased their risk over what he promised them, what he led them to believe. So you can infer from the totality of the circumstances that he knew that those mailings would enable him to temporarily divert the money from one project, and as he hoped, to be successful enough to return it back to the first. Now with respect to his claim of the insufficiency, he's relying upon in this argument to you that he did not have the intent to defraud, the intent to deceive. What he fails to grapple with is that that intent of acting in good faith cannot coexist with false and fraudulent statements that are made as part of the scheme. You cannot have good faith on one hand and deceitful false statements on the other hand. So the question that we have to look at, which the jury looked at, where they had more than ample evidence is, did he intend to deceive the investors on the issue of that he was going to divert the money, and on the issue of their investments being secured by trustees? Mr. Harmon had dealt with investors for years. These investors came to him and said, we want to invest with you. He led them down a primrose path. He said to them, I'm going to invest your project into Greenpoint. Greenpoint is a viable, healthy, solid project. Here's a diagram. Here's the drawings. Here's the loan-to-value ratios. Here's the trustee that I'm securing it with. Go out and drive to the project. Let me take you to the project. Here's construction control. I'm proving to you that your money is going to be used for that project because it's going to be disbursed to you because it's going to be controlled. Let me try a hypothetical. Take Greenpoint. And the mortgage broker, I won't use Mr. Harmon's name, the mortgage broker acquires money to invest in Greenpoint. But they don't need that money yet. It's going to be another eight months before they actually need those funds. Does the broker have discretion to do anything with the funds in the meantime? Do they leave them in the title company's vault? Or what do they do? His discretion is limited, is bounded on all four sides by what he represented to the investors. If he told those investors, I'm going to use your money for Greenpoint, and here's the risk that are inherent in Greenpoint, he cannot do anything with that money but use it for Greenpoint, which means he needs to leave it with the title company in its escrow. So if it got put into a federally insured institution, he'd still be guilty of, or that broker would be guilty of the same thing that Mr. Harmon was convicted of? If he's taking it to invest it somewhere else, even in a federally insured, yes, because that was not his representations to the investors. In this particular case, it wasn't a sure investment as the hypothetical you're giving me. And there's a reason for that. It seems to me that it would be unlikely that you would be able to obtain a conviction if he in fact put the money in First National Bank of Nevada where it was all found later and so forth, because that wouldn't necessarily be inconsistent with the representation made to the investor, or at least you might have difficulty proving that he intended to deceive as opposed to, said, made a representation which inherently included an understanding that the money would be kept safe in the meantime. Now, I understand the case here is somewhat different because the diversion to other projects involve a much greater degree of risk, but there's still some question as to, at one point, does failure to tell the investor something constitute fraud? When that concealment, when that failure to disclose involves a material misrepresentation. Material misrepresentation is when it has the power or the reasonable probability of failures. A material misrepresentation is the concealment here of not disclosing to them that he intended to divert their money to projects, as he by his own words said, going down the dumper, facing foreclosure, or in financial distress. Would it have been a material misrepresentation if he told them, hey, I'm just going to hold that money at the First Bank of Nevada that's secured by the federal government, that's going to satisfy that material, the materiality requirement? Here, because of the nature of what he was going to do with the money, because he knew it was so material, intent to deceive can be inferred from the nature of that statement and from what he knew the circumstances were. Indeed, he had investors. He had elderly people. Louise Ellsworth and her husband, her husband who was a carpenter all of his life, came to him and asked him repeatedly, is my investment as sure as a lead pipe cinch, using Mr. Ellsworth's words? Or is Jody Evans, who took her children's education funds and gave it to him and constantly called him and grilled him about the security and the nature of her investments? Or as others, Louise Dominguez, Ms. Dominguez, who said constantly, how is it doing? Is it secure? We're not going to invest with you any more than $5,000 because we want to know that that investment is secure. He knew from those investors that he had a duty to disclose what he was going to do with the money. He knew that he was going to disclose the money to the people who received the documentation. That's a red herring. That documentation, if you look at it, is so confusing, even to the experts in the field, that they constantly called the mortgage or the escrow officers and said, what does this mean? Mr. Blecker, who had been in the business for 25 years handling complex real estate transactions of the commercial nature, said he was repeatedly contacted by realtors, by other clients, to clarify the meaning of those documents. Those trustees that he talks about only relate to two of the loans that involve trustees. Some of the loans where there are any misrepresentations of trustees, the documentation has no effect. For instance, on the Heather Ridge loan that involved $650,000, Mr. Harmon's defense was, hey, I intended that loan to be secured by a first deed of trust. It was my intention that that was the case. Well, first of all, the evidence presented to the jury overwhelmingly showed that that was not his intention. When he, according to, and this is what was presented to the jury, according to Donna Wills, the escrow officer, when she set up the loan, Mr. Harmon initially said, take enough money out of the loan to go obtain the deed of reconvenances so that $650,000 can become a first. While that escrow was open, and before any money was collected, Mr. Harmon instructed her not to take the money and obtain the deed of reconvenances. While she doesn't remember his exact words those many years ago, she knows from her notations on the records that she had in the escrow company that he told her that that first, that the $650,000 would remain a third. You know what? Even if it was his intention, he had a duty to disclose that intention to those investors. He certainly would have wanted to know, am I in reality getting a first deed of trust or am I going to get one that's your intentions? He knew that. This guy didn't fall off the turnip wagon the day before. He'd been in this business for years. Given all of those circumstances, the evidence was presented to the jury that was overwhelming, that they knew what his intent was, and he had the intent to deceive. Let me shift your focus. Mr. Harmon raised one other issue relating to his sentence. And, in fact, he sent in a 28-J letter. But I want to put that aside for a moment. His argument was, was that the district court did not make a proper finding for the enhancement for obstructing justice, and the enhancement was based on his alleged perjury during the course of the trial. Were the district court judge's statements prior to imposing the enhancements clear that he was making a finding that he willfully testified falsely? Okay. If you're focused on the – the answer overall is yes. If you're focusing on the specific phrase of the element willfully, the answer is yes. I'm concerned that it's not so clear that the district court judge made a finding that he testified – you know, willfully testified falsely. When Judge Crow was giving the sentence, he just simply – it started off this way. I have dealt with these issues before this circuit before, so I wanted to be very careful that he made a specific finding. So I read the transcript to the judge of exactly what the defendant said that was false, so there would be no mistake as to what I wanted him to find the falsity on. The judge then said, I find that in light of the jury verdict that you testified that you committed perjury, and I'm going to give you the enhancement. I was concerned because I wanted to make sure the judge was making that finding because he himself was considering it and not because he was merely going along with the jury verdict. And so I asked him that question. Judge, is this your finding independent of it? And he said, yes, it is. And he said throughout the course of his finding, I adopt – I am going to impose enhancements for the reasons stated by the United States and for the reasons set forth in the pre-sentence report. And that report specifically stated that the defendant's testimony was willfully falsely made. Well, it says that the defendant willfully impeded or obstructed or attempted to impede or obstruct the administration of justice by testifying falsely. Yes. He willfully… And then it goes on to explain that the reason it says that is that the jury found against him. That's what – that was 45 that he adopted. That's what it says. At 45? I'm sorry, I didn't understand. Paragraph 45. Paragraph 45. Wasn't it paragraph 45? Yes, it was paragraph 45. Yeah. I mean, that's what the – that's what the writer of the PSR said. He said he did it willfully. And then in an explanation, according to the government, he said X and they said Y and the jury found against him. So therefore it was willful. I submit that a reasonable reading of paragraph 45 is that you, looking at as a whole the word willfully, when it says you willfully obstructed justice by testifying falsely, that you would have to read that as a whole and say that the willfully modifies – not the actual act of obstructing, that is, falsely testifying before the grand jury – before the trial of this case. Now, the leading case in this, as you well know, is United States v. Dunnegan. And while the Supreme Court has said we encourage judges to be specific as to each element, we'll have to read it as a whole in some cases to see if there's sufficient basis that's there. And I would submit that if you read this entire portion of the sentencing transcript, that Judge Proe was clearly saying, you got on that witness stand, you knew what you were doing. Given the nature of your statement that you represented to the investors that Greenpoint was secured by a first trustee and all of them said it was secured by a second, that you acted willfully in doing what you did. And indeed, I think you can read into Judge Proe's statement that as strongly as he felt about the jury verdict, the jury was clear on that point that in light of Dunnegan, you can find that it was willful. Well, you know, the district court judge said, in this case, I think that the assessment of the two additional levels at paragraph 53, and hence the finding at 45, explaining it, and Judge Fernandez just explained it at 45, are appropriate. And so I will overrule that or those objections. And then I go on from that point, because I was concerned and I wanted to make sure the record was clear. And I said, Judge, is this your finding, or are you relying solely upon what the jury says? Because three black robes in San Francisco are going to be pounding. Well, no, what you said to him, you were talking, you speak to the judge and you say, Your Honor, you of course acknowledge, I mean, your position is you acknowledge that you have the discretion to find differently from the judge's ruling and that you From the jury's ruling. From the jury's ruling. And that you, and then the judge interrupts you and says, I do. But the jury's ruling, the finding, the verdicts of the jury nonetheless do inform my decision as well. But my question goes to, did he make a finding of willfully testified false? And directly, to answer your question precisely, he did not say those words. I think you have to infer it from both the pre-sentence report, reading it broadly, as I suggest, as well as from the judge's hearing of the testimony and the stark dichotomy between what the investor said and what the defendant said, and looking at the evidence in totality. If you find differently, then I submit the appropriate remedy is to send it back to Judge Proh for him to make that finding again, or to make that finding more explicitly. You sure tried to get it straightened out, but the question is what you made it. You know what the reality is? I knew clearly what to do. Sometimes when you stand on your feet, your mind goes blank and you don't think of everything you need to say. And sometimes, of course, when you push the judge enough, you don't want to keep pushing so far to incur the wrath and you have to answer that question, did I adequately cover it, and I'm not going to let it go from here. That's what I was feeling at the time. Thank you. All right. Thank you. Well, on the last point, I do believe that Judge Proh wasn't explicit. He did not find that Mr. Harmon committed perjury. He did not outline the reasons why he stated that he testified falsely. I believe there was ample reason for our discussion today and from my having participated in the trial, this jury could have concluded that Mr. Harmon was guilty, even though it may not have found that he lied. I don't think the district court judge has to point specifically to a particular answer or a particular line of inquiry or something, but the judge has to make it clear that he's finding that he willfully testified falsely in some respects. I agree. And I believe Dunnegan establishes that he has to find that he committed perjury. Yes. And from the evidence that was presented, this jury may well have concluded, as you have pointed out, that Mr. Harmon had an obligation to reveal things that he didn't reveal, and therefore he was guilty, given the fact that he admitted so many other things about what had happened. There was very little that he denied. He denied misrepresenting the trustees. The jury may well have found that he hadn't misrepresented the trustees directly, but that he had an obligation to tell these people directly what it was they were investing in. But the court, there is that confusion, and the court did not find that Mr. Harmon committed perjury. And I do believe that the Blakeley decision now is directly on point. Well, there are a number of other panels, obviously, that have the Blakeley issue in front of it, so. Well, thank you, gentlemen. I appreciate your time. May not be able to address that. Okay. Thank you. Matter stands submitted. Thank you. Do you guys need a break? You don't need a break, do you? Or do you? No. It shouldn't be this empty. Harrington versus Ignacio. It's our last case for the day. Please report. My name is Paul Turner. I'm an attorney for David Harrington with the Federal Public Defender Office in Las Vegas. I'd like to reserve two minutes, Your Honor, if I might, for rebuttal. Obviously, I'd be happy to respond to any questions the Court has in any order, but in lieu of that, I will begin with the issues as presented in my brief, at least the first two issues, and then I may jump ahead a little bit. Mr. Harrington committed, according to the jury, Mr. Harrington committed what we say is one kidnapping.
judges: Fernandez, Paez, Clifton